RONALD DANKO, Plaintiff-Appellee, v. BOARD OF TRUSTEES OF THE CITY OF HARVEY PENSION BOARD *et al.*, Defendant-Appellant.

First District (1st Division)   No. 1—91—2009

Opinion filed December 28, 1992.

634

Buikema, Hiskes, Dillner, O'Donnell & Marovich, Ltd., of South Holland (Timothy C. Lapp, of counsel), for appellant.

Cullen, Haskins, Nicholson & Menchetti, P.C., of Chicago (Charles G. Haskins, Jr., of counsel), for appellee.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

After being injured while on duty as a police officer for the City of Harvey, plaintiff Ronald Danko's request for a disability retirement pension was denied by the City of Harvey police pension board (the Board) for the reason that there existed an established "light duty" position he could physically perform. On judicial review of the Board's decision (Ill. Rev. Stat. 1989, ch. 110, par. 3—102), the circuit court reversed on the grounds that the Board was prejudiced and that the "light duty" job offered to Danko was a "hoax" created "specifically to disadvantage this plaintiff's entitlement to a pension." The Board appealed to this court arguing that (1) the trial court erred in reversing the Board's decision because board member Nick Graves' statements did not evidence bias or prejudice toward plaintiff, and (2) the Board's decision denying a disability pension to plaintiff was not against the manifest weight of the evidence. We affirm the circuit court's decision reversing the Board and awarding plaintiff a disability pension.

Plaintiff became a police officer for the City of Harvey on September 13, 1975. The various job titles and positions plaintiff held included patrol officer, detective, police counselor, administrative assistant, watch supervisor, watch commander, director of community affairs, commander of the service bureau and acting patrol commander. The requirements of these jobs included walking for as many as one or more hours, driving a car for eight hours at a time, directing traffic, supervising and being physically involved in violent confrontations or disputes on the street, carrying injured persons or pushing disabled vehicles.

On May 21, 1987, after the morning roll call, plaintiff slipped and fell and hurt his back while walking through the station corridor on his way to his police car. He sought immediate medical attention at Ingalls Memorial Hospital and went off work. Subsequently, on June 10, 1987, plaintiff underwent a laminectomy. After the surgery, plaintiff underwent physical therapy two or three times per week and returned to work on or about September 10, 1987.

Due to his injury, he was assigned to light station duty which involved sitting at a desk. His supervising officer was Nick Graves, who later became chief of police and a commissioner on the pension board. After one-half hour of work, plaintiff was suspended by the then chief of police, Barry Hughes. The Civil Service Commission conducted hearings in regard to plaintiff's suspension and, on June 7, 1988, discharged plaintiff on the grounds that he (1) struck his wife at a restaurant in Lynwood, Illinois, and (2) submitted false injured on duty report forms for August 22, 1987, through August 31, 1987. On November 28, 1989, on judicial review of plaintiff's discharge, the circuit court reversed and ordered plaintiff reinstated to his job as a Harvey police officer. The trial court concluded that the appropriate sanction was suspension without pay and without benefits for the period from September 9, 1987, through November 28, 1989.

One week later, on December 5, 1989, plaintiff returned to work. He had a meeting with Nick Graves, who was then chief of police, and Inspector Linkus. Plaintiff told Chief Graves he could not return to full duty because of his back problems. Chief Graves then asked plaintiff if he could do light duty work. Plaintiff responded that he could do some light duty work as long as he had the freedom to sit when he needed to sit, to stand when he needed to stand, and to lie down when he needed to lie down. Chief Graves then assigned him to an eight-hour-per-day shift wherein he was to stay in his apartment and fill out hourly reports of his activities. This at-home shift was to last "[u]ntil this pension thing is over." Approximately three weeks after being given this duty as "officer in charge of guarding [his] apartment," Chief Graves suspended plaintiff pending termination allegedly for getting into another altercation with his now ex-wife.

Plaintiff finally received his pension hearing in 1990. Plaintiff had first applied for a disability pension on October 9, 1987, one month after his first suspension. He had to submit two more requests for a hearing on his disability pension, the last on May 16, 1988, before a hearing was scheduled. The hearing was held over four days: January 26, 1990, April 6, 1990, April 26, 1990, and May 17, 1990. The Board was made up of five people: (1) Robert Cochran, who was a retired police officer and chairman of the board on the January 26 and April 6 hearing dates; (2) Chief of Police Nick Graves, who was chairman of the pension board on the April 26 and May 17 hearing dates; (3) Christopher Barton, who was deputy chief of operations for the City of Harvey police department; (4) Marsha Bond, who was the city clerk of Harvey; and (5) Marian Beck, who was the service bureau administrator working under Deputy Chief of Police Green.

Plaintiff made several motions at the start of the hearing to have Chairman Cochran and Chief Graves recuse themselves from the pension hearing on the grounds that they were biased against plaintiff and unable to give him a fair and impartial hearing. In support of the motions, plaintiff testified to several conversations he had had with Cochran and Graves sometime prior to the hearing. Plaintiff first testified to several conversations he had with Chairman Cochran. According to plaintiff, after requesting a hearing and getting no response from the Board, he twice contacted Chairman Cochran personally and asked him about his hearing. Chairman Cochran responded by telling him he would not get a pension hearing because the chief had a light duty job for him. Plaintiff also testified to several conversations he had with Chief Graves at a restaurant sometime in 1988. He testified that Graves told him that "the City's [sic] got a lot more money than you do and they [sic] are going to run you dry, and there is no way they [sic] are going to settle or give you a thing." Additionally, Chief Graves was the person who suspended plaintiff at the end of 1989. Understandably, plaintiff's attorney wanted to subpoena him and ask him questions regarding any possible bias. The motions to have Cochran and Graves recuse themselves were denied, and plaintiff was also denied the ability to call and question Chief Graves in his case in chief.

During the hearing, Commissioner Beck asked plaintiff why he was suspended pending termination the second time in December 1989. Plaintiff stated that Chief Graves had ordered Inspector Linkus to go speak with plaintiff's wife in order to "find out some way that they could *** fire me again." Chief Graves then exploded in indignation, claiming that plaintiff's statement was "an outrageous lie." Plaintiff's counsel then renewed his motion to have Chief Graves recuse himself because he was obviously upset and predisposed to finding against plaintiff. Chief Graves admitted he was upset, because "[w]hen someone lies personally to me, I get upset." Graves stated that he could indicate when plaintiff "is lying when he is lying about me because personally I know he is lying about me." The motion was denied and plaintiff had to be satisfied with Graves' assurances that he would give plaintiff the "fairest treatment" and that the fact that he had suspended plaintiff for conduct unbecoming a police officer had no bearing on the case.

Later in the record in a clearly hostile exchange, Chairman Graves asserted that if plaintiff had not gotten suspended he would possibly still be working light duty and that if "the Chief feels that you could do [light duty] and would be accepting you back to do that,

it's well and it's right for you to do that." Again, as he did several times throughout the hearing, plaintiff's counsel renewed his motion to have Chief Graves recuse himself and to allow him to question the chief regarding any possible bias he may have against plaintiff. Specifically, counsel wanted to inquire into the chief's alleged statements to plaintiff that the City would "run him dry" and not give him a pension as well as the fact that the chief most recently suspended plaintiff and pressed for his termination.

At the hearing, plaintiff testified that he cannot sit for more than 20 minutes to an hour at most. He must then stand. He cannot stand, however, for more than 15 to 20 minutes. He experiences a great deal of pain and then his muscles become numb and collapse and his body will give way and fall if he fails to find something on which to hold. He cannot sit still for extended periods in a car either. Several times a day, when the pain is extremely bad, plaintiff must lie down for 15 to 20 minutes to straighten his back out.

The consensus of all medical opinions was that plaintiff is permanently injured and cannot go back to full duty as a police officer. He has a degenerative back disorder which may require further surgery in the future. Two of the physicians, Edward J. Winter, M.D., and David J. Smith, M.D., gave their unqualified opinions that plaintiff could not perform any type of police work, including the "light duty" functions. Both doctors took into account plaintiff's need to frequently change positions and take rest periods. Three physicians, John F. Shea, M.D., Mark Lorenz, M.D., and Michael R. Zindrick, M.D., were unable to give their opinions on whether plaintiff could perform the "light duty" work on the grounds that the job description of light duties provided them with inadequate information. Specifically, they stated that in order to give their opinions on whether plaintiff could perform the light duties, they needed to know the amount, length, and duration of any sitting, squatting, lifting, or standing involved. Two doctors, Arthur E. Ostergard, M.D., and Leon Malchinski, M.D., gave their opinions that plaintiff could perform the "light duty" work. Their opinions, however, did not take into account plaintiff's need to constantly change his position. Finally, after the above medical opinions were given, plaintiff submitted to a "Functional Capacities Assessment" at the Paulson Rehabilitation Center at Willowbrook. The ultimate assessment report noted that although the specific physical demands of "light duty" were not apparent from the job description, plaintiff performed best when able to alternate between sitting, standing and walking.

Plaintiff testified that he could not perform the light duty work listed in the document "Police Officer Assigned To Station Duties." He stated that although he could perform many of the jobs for short periods, there is nothing to indicate that he could take frequent breaks as he needed and for as long as he needed. Additionally, he testified that this light duty job description of "Police Officer Assigned To Station Duties" never existed prior to 1988 and was created just for him. He stated that injured officers have been assigned to *temporary* light duty, but never to *permanent* light duty positions. In response to an inquiry from Commissioner Bond, plaintiff explained that the types of functions listed on the document titled "Police Officer Assigned To Station Duties" are done full time by people hired to do that type of work. He stated, "the history of the police department has records and—clerks to handle records. They have dispatchers to dispatch. They have dog warrants to catch dogs. They have filing clerks to file." He testified that the department has never before assigned a police officer to assist in these duties on a permanent basis. In response to questioning by Chief Graves, plaintiff stated that the types of injuries officers assigned to light duty had were broken arms or legs or sprained muscles and they were on light duty only until they recovered. He testified that officers with injuries that never got better were pensioned off.

Officer Fuller was subpoenaed to testify by plaintiff. Fuller wrote the document identified as "Police Officer Assigned To Station Duties" in early April 1988 at the direction of then Chief of Police Hughes. Hughes had indicated to Fuller that such a job description was needed and that plaintiff would be assigned to such duties. Fuller testified that in preparing the document he drew from his own experience on light duty and he also combined the job descriptions of records clerk and radio dispatcher. Fuller stated that assigning injured officers to light duty was common, but that there had never before been a light duty job description actually reduced to writing. In response to an inquiry by Commissioner Barton, Fuller testified that officers were assigned to light duty for "pretty much an indefinite period of time based on when the doctor said they could go back to full duty."

Inspector Linkus testified for the purpose of explaining the light duty job description titled "Police Officer Assigned To Station Duties." Linkus was the inspector of professional standards. He asserted that light duty had been given to injured officers since at least 1970. He stated that the present light duty policy is expressed by the document identified as "Police Officer Assigned To Station Duties." He

testified that injured officers are placed on light duty when their doctors say they cannot perform full duty. These officers remain on light duty until eventually released by their doctors. Mr. Dillner, the attorney for the Board, then asked Linkus whether an officer would be permanently assigned to light duty if he were never released by his doctor. Linkus responded, "that's right." Linkus then asserted that the department makes special accommodations for persons on light duty and that in every case they will tailor the job to meet the needs of the specific individual. He testified that this is not "something new" only created for plaintiff and that his physical needs would not restrict him in his ability to do light duty. Additionally, Linkus mentioned that the department had purchased a cot in 1980 for a female matron and that the plaintiff could use it to lie down if he needed. On cross-examination, Linkus admitted that presently there were no officers assigned to light duty and that, in his 20 years on the police force, no one had ever been assigned permanently to light duty.

Some illustrative examples of the work for a police officer assigned to station duties include among other things (1) receiving telephone calls, (2) dispatching police personnel and equipment by radio, (3) monitoring calls for fire fighting and ambulance equipment, (4) maintaining various logs and records, (5) receiving complaints, (6) typing, filing, and assembling records and reports, (7) classifying received criminal complaints and reports, and (8) reviewing and processing warrants.

Plaintiff also introduced evidence concerning several former officers who were receiving disability pensions. Officer Dan Blecken suffered a knee injury and, at the time of the hearing, was driving a gravel truck. Officer Coleman McCarthy, at the time of the hearing, was an investigator for the Cook County State's Attorney and receiving a disability pension. Additionally, Officers Bob McGinnis and Randy Lipisenere were pensioned off after developing heart troubles.

At the close of the evidence, plaintiff requested a line of duty disability pension pursuant to section 3—114.1 of the Pension Code (Code) (Ill. Rev. Stat. 1989, ch. 108½, par. 3—114.1). In the alternative, plaintiff requested a not on duty pension pursuant to section 3—114.2 (Ill. Rev. Stat. 1989, ch. 108½, par. 3—114.2). The Board found that plaintiff was injured while on duty as a police officer for the City of Harvey. The Board denied plaintiff's request for a disability retirement pension, however, because there existed an "established light duty position" as specified in the police department's job description "Police Officer Assigned To Station Duties" which plaintiff could perform. On judicial review, the circuit court reversed the administrative

decision to deny plaintiff a disability pension, reasoning both that the Board was prejudiced against plaintiff and that the permanent light duty job description was established solely to deprive plaintiff of his pension.

The trial judge's first conclusion was that plaintiff was denied a fair hearing because the pension board hearing officers were biased and prejudiced against plaintiff. Specifically, the trial judge determined that Chief Graves' comments to plaintiff prior to the hearing that the City of Harvey was going "to run you dry, and there is no way they are going to settle or give you anything" were clearly reflective of bias and that he had "in some measure adjudicated [sic] the facts as well as the law of the case in advance of hearing it." The trial judge added that the prejudice of one board member necessarily taints the action of the entire board.

On appeal to this court, the Board argues that Chief Graves' statements did not evidence any personal bias on his part toward plaintiff. The Board asserts that the statements were made in the context of a meeting between "friends" and that Graves was only advising plaintiff as to the obstacles he should reasonably expect to encounter. Additionally, the Board asserts that Graves was not even one of its members at the time he made those statements.

■ ■ The function of the circuit court on judicial review of an administrative determination is not to reweigh the evidence, but merely to determine if the conclusion is against the manifest weight of the evidence. (*Collura v. Board of Police Commissioners* (1986), 113 Ill. 2d 361, 372-73, 498 N.E.2d 1148, 1153.) However, this deferential standard is not controlling where the Board is prejudiced or biased against the claimant and incapable of giving him a fair hearing. (*Carrao v. Board of Education* (1977), 46 Ill. App. 3d 33, 39, 360 N.E.2d 536, 541.) In order to establish the bias or prejudice of an administrative decision maker, a claimant must show more than the mere possibility of bias or that the decision maker is familiar with the facts of the case. (*Collura*, 113 Ill. 2d at 370, 498 N.E.2d at 1152; *Grissom v. Board of Education of Buckley-Loda Community School District No. 8* (1979), 75 Ill. 2d 314, 320, 388 N.E.2d 398, 400; *Batka v. Board of Trustees of the Village of Orland Park Police Pension Fund* (1989), 186 Ill. App. 3d 715, 721, 542 N.E.2d 835, 838-39; *Carrao*, 46 Ill. App. 3d at 39, 360 N.E.2d at 541.) The claimant must demonstrate that the decision maker is not " 'capable of judging a particular controversy [fairly] on the basis of its own circumstances.' " (*Grissom*, 75 Ill. 2d at 320, 388 N.E.2d at 400, quoting *Hortonville Joint School District No. 1 v. Hortonville Education As-*

*sociation* (1976), 426 U.S. 482, 493, 49 L. Ed. 2d 1, 9, 96 S. Ct. 2308, 2314; accord *Carrao*, 46 Ill. App. 3d at 39, 360 N.E.2d at 541.) Although there is a presumption that administrative decision makers are "men of conscience and intellectual discipline" who are able to objectively and fairly judge each particular case on its own facts and set aside their own personal views (*Grissom*, 75 Ill. 2d at 320, 388 N.E.2d at 400), a claimant may show bias or prejudice "if a disinterested observer might conclude that the administrative body, or its members, had in some measure adjudged the facts as well as the law of the case in advance of hearing it." (*A.R.F. Landfill, Inc. v. Pollution Control Board* (1988), 174 Ill. App. 3d 82, 89, 528 N.E.2d 390, 394.) Additionally, if one decision maker on an administrative body is not completely disinterested, his participation " 'infects the action of the whole body and makes it voidable.' " (*Board of Education of Niles Township High School District No. 219 v. Regional Board of School Trustees* (1984), 127 Ill. App. 3d 210, 213, 468 N.E.2d 1247, 1249-50, quoting *City of Naperville v. Wehrle* (1930), 340 Ill. 579, 581, 173 N.E. 165, 166.) "Interest" does not necessarily mean a pecuniary interest, "[i]t need only be an interest which can be viewed as having a potentially debilitating effect on the impartiality of the decision maker." *International Harvester Co. v. Bowling* (1979), 72 Ill. App. 3d 910, 914, 391 N.E.2d 168, 171.

■ In the instant case, a disinterested observer would conclude that Chief Graves had prejudged plaintiff's claim. Initially, we agree with the Board that Chief Graves' prehearing statements to plaintiff that the City would "run him dry" are insufficient to establish bias or prejudice against plaintiff. The statements were made more than a year before the hearings, before the chief was on the Board, and in the context of a meeting between "friends." However, in view of these statements by Chief Graves along with other actions and statements made by him before and during the hearing, it becomes clear that Graves was unable to judge plaintiff's case fairly and objectively.

It was Chief Graves who, in December 1989, less than one month before plaintiff's pension hearing, suspended plaintiff and pressed for his termination for conduct unbecoming a police officer. Additionally, the Board refused to allow plaintiff to question or cross-examine the chief on any possible bias or even the reason why he suspended plaintiff. In fact, every motion or objection of plaintiff's counsel appears to have been overruled, including the motions to have Cochran and Graves recused, to question Graves on his alleged bias, as well as to question Inspector Linkus and Officer Rizzi on any prejudice either may have harbored against plaintiff.

Most importantly, however, are several statements made by Chief Graves *during* the hearing. First, Chief Graves called plaintiff a "liar" after plaintiff responded to Commissioner Beck's inquiry into why he was suspended the second time in December 1989. Plaintiff stated that the chief had sent Inspector Linkus to speak with plaintiff's wife in order to "find out some way that they could *** fire me again." The chief admitted he became very upset at plaintiff's answer and called plaintiff's statement "an outrageous lie." Second, during clearly hostile questioning of plaintiff by Chief Graves, Graves asserted that if plaintiff had not gotten suspended he would possibly still be working light duty. Third, during this same exchange, Chief Graves stated his belief that if "the Chief feels that you could do [light duty] and would be accepting you back to do that, it's well and it's right for you to do that." Clearly, these statements and actions would indicate to a disinterested observer that Chief Graves had "in some measure adjudged the facts as well as the law of the case in advance of hearing it."

The Board argues, however, that this case is analogous to *Grissom v. Board of Education of Buckley-Loda Community School District No. 8* (1979), 75 Ill. 2d 314, 388 N.E.2d 398. In *Grissom*, after an administrative hearing, the board of education voted to dismiss the plaintiff, Richard Grissom. The board chairman admitted to making a statement that he had never stopped trying to get rid of Grissom. (*Grissom*, 75 Ill. 2d at 321, 388 N.E.2d at 400.) The *Grissom* court found the board member's statement to be "thoughtless and indiscreet, but hardly so substantial as to evidence a vendetta or prejudice" sufficient to set aside the board's decision. (*Grissom*, 75 Ill. 2d at 321, 388 N.E.2d at 400.) The Board, in the instant case, asserts that, like in *Grissom*, Chief Graves' statements that the city would "run him dry" may have been "thoughtless and indiscreet" but they were not sufficient to show bias. *Grissom* is distinguishable.

First, as stated above, it is not solely these statements by Chief Graves which convince us that an objective observer would conclude the chief was biased. We agree with the Board that under *Grissom* the chief's statements that the city would not give plaintiff his pension were insufficient to establish Chief Graves' prejudice. However, unlike in *Grissom*, Chief Graves made several statements *during* the hearing which evidence his bias. In *Grissom*, nothing was done during the hearing which demonstrated bias or unfairness. During the hearing in the instant case, however, Chief Graves stated, in effect, that he believed that if plaintiff had not gotten himself suspended he would still be working light duty. He also asserted that if the chief of

police says he has a light duty position for an injured officer, that injured officer should unquestioningly accept it.

In addition, in *Grissom* the allegedly biased board member was not intricately involved in the plaintiff's situation. In this case, however, Chief Graves was a "prominent player" in the events unfolding before the Board. Plaintiff testified to the substance of several conversations he had with Chief Graves prior to the hearing. Additionally, in September 1987, Graves was plaintiff's supervisor when he was suspended after one-half hour of work. Moreover, Graves assigned plaintiff to light duty when he came back to work in December 1989. Graves then suspended plaintiff pending termination in late December 1989. Graves also called plaintiff a "liar" during the hearing and plaintiff was not permitted to question him as to any possible bias he may have against him. Since plaintiff's credibility was in issue, to an extent so was Graves'. Yet, Graves was the chairman of the board which was determining his own credibility.

Chief Graves was not simply "familiar with the facts of the case," and plaintiff has clearly shown more than the mere possibility of bias. Graves' involvement as a supervisor to plaintiff along with his statements before and during the hearing demonstrate that he was not able to judge the controversy fairly on the basis of its own circumstances. Additionally, due to his influence on the Board as elected chairman, his participation "infected" the action of the entire board.

Notwithstanding our conclusion that the Board was biased against plaintiff, we also hold that the Board's decision to deny plaintiff a disability pension because there was an established light duty position was against the manifest weight of the evidence. In reversing the administrative decision to deny plaintiff a disability pension, the circuit court determined that the light duty position offered to plaintiff was a "hoax" created "specifically to disadvantage this plaintiff's entitlement to a pension." The court noted that no police officer had ever been assigned permanently to light duty and that this position was created after the ongoing dispute between plaintiff and the city had begun and the city had determined to get rid of him. The court reasoned that plaintiff can indeed do much of the work described in the light duty job description, but "he can only do these things in very short spurts" and then must change his position in order to alleviate his pain. The court concluded that the light duty job description does not accommodate plaintiff's type of injury which requires that he be permitted to change his position at frequent, unscheduled intervals. Therefore, the circuit court held that plaintiff was totally incapacitated.

On appeal, the Board asserts that the record supports the conclusion that plaintiff could perform the assignments outlined in the established light duty job description. The Board brings to our attention that both Fuller and Linkus testified that the department has a long-standing policy of placing injured officers on light duty. The Board also maintains that Linkus' testimony supports the conclusion that an assignment to light duty could be permanent if an injured officer was never authorized by his doctor to go back to full duty. It also points out that the physicians were in disagreement as to whether plaintiff could perform the light duty functions and it was free to accept the medical testimony which stated plaintiff could do light duty assignments. The Board states that "it is clear that plaintiff is able to perform the duties outlined in the light duty job description, provided that he is allowed to change positions at frequent intervals." Since Inspector Linkus testified that special arrangements could be made to accommodate plaintiff's physical limitations, the Board argues that its decision that there existed an established light duty position which plaintiff could perform was not against the manifest weight of the evidence.

■ The Administrative Review Law requires a trial court to hold the findings and conclusions of an administrative agency on questions of fact to be *prima facie* true and correct. (Ill. Rev. Stat. 1989, ch. 110, par. 3—110; *Batka*, 186 Ill. App. 3d at 722, 542 N.E.2d at 839.) The function of the circuit court on judicial review of an administrative determination is not to reweigh the evidence, but merely to determine if the conclusion is against the manifest weight of the evidence. (*Collura*, 113 Ill. 2d at 372-73, 498 N.E.2d at 1153.) In order for an administrative determination to be against the manifest weight of the evidence, the court must conclude that "all reasonable and unbiased persons, acting within the limits prescribed by law and drawing all inferences in support of the finding, would agree that the finding is erroneous and that the opposite conclusion is clearly evident." (*Batka*, 186 Ill. App. 3d at 722, 542 N.E.2d at 839-40, citing *Hahn v. Police Pension Fund* (1985), 138 Ill. App. 3d 206, 209, 485 N.E.2d 871, 874.) The trial judge may not reverse merely because he would have reached the opposite conclusion. (*Hahn*, 138 Ill. App. 3d at 209, 485 N.E.2d at 874.) It is the Board's duty to weigh the evidence and "there need only be some competent evidence in the record to support its findings." *Hahn*, 138 Ill. App. 3d at 209, 485 N.E.2d at 874.

■ Section 3—114.1 of the Code provides the requirements for a police officer to receive a "line of duty" disability pension. It provides in pertinent part:

"If a police officer as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, is found to be physically or mentally disabled for service in the police department, so as to render necessary his or her suspension or retirement from the police service, the police officer shall be entitled to a disability retirement pension of 65% of the salary attached to the rank on the police force held by the officer at the date of suspension of duty or retirement." (Ill. Rev. Stat. 1989, ch. 108½, par. 3—114.1.)

The second district in *Thurow v. Police Pension Board* (1989), 180 Ill. App. 3d 683, 690-91, 536 N.E.2d 155, 160, recently interpreted this provision for a police "line of duty" pension to mean that in order to receive a disability pension a *police officer* must be unable to perform *police service*. In other words, under this statute, a police officer is not entitled to a disability pension if there is an available and existing full-time light duty position within the police service which he can perform. See *Thurow*, 180 Ill. App. 3d at 691, 536 N.E.2d at 160.

■ The record in this case supports the following factual conclusions: (1) that the plaintiff injured his back while on duty as a police officer for the City of Harvey; (2) that the plaintiff's injury is permanent and prohibits him from performing the full duties of a police officer; (3) that the plaintiff's injury requires him to frequently change his position in order to relieve the pain; (4) that injured officers are commonly assigned to light duty until allowed to return to full duty by their doctors; (5) that any permanently injured officers are routinely "pensioned off"; (6) that plaintiff first applied for a disability pension on October 9, 1987; (7) that the light duty job description of "Police Officer Assigned To Station Duties" was first put in writing in April 1988, with plaintiff in mind for the position; (8) that two of seven physicians who examined plaintiff stated he could do the light duty job assignments described in the document referred to as "Police Officers Assigned to Station Duties"; (9) that the light duty job description does not include the physical requirements of the work (*i.e.*, the amount, length, or duration of any sitting, squatting, lifting, or standing); and (10) that no officer has ever been assigned to permanent light duty. Based upon a review of the evidence and the uncontroverted facts in the record, we hold that it is clearly evident that plaintiff is permanently disabled and that the decision of the Board was against the manifest weight of the evidence.

Plaintiff concedes he can do the light duty work as long as he can change his assignment whenever he physically requires a change of position. His main complaint is that the job description does not in-

clude the physical parameters of each assignment. However, Inspector Linkus testified that the department will make special accommodations for injured officers assigned to light duty and will "tailor" the job to meet the physical needs of the individual. Therefore, if there is an established light duty position and, as Inspector Linkus' testimony would indicate, the police department is willing to "jump through hoops" to accommodate plaintiff and make it possible for him to fulfill the requirements of that position, we cannot say that the Board's decision that plaintiff is capable of performing the work was against the manifest weight of the evidence. Although we may consider the department's attitude in this matter extremely juvenile in light of the fact that plaintiff's physical condition renders him unable to do any kind of meaningful work and would probably render him extremely nonproductive in any capacity in the police department, our review is limited to the question of whether there is an established light duty position which plaintiff is capable of performing.

On the other hand, although Inspector Linkus may say the department will make special accommodations for plaintiff's disability, there is no real evidence that it can. A blanket statement that the department has always tailored light duty to fit the injured officer and will "tailor" the position to fit plaintiff is insufficient absent evidence that it can be done. In fact, it is hard to think of any job which would lend itself to the type of injury from which plaintiff suffers. Additionally, a review of the opinions of the two Board physicians who determined that plaintiff could perform the light duty work makes it clear that, in coming to their conclusions, they did not consider plaintiff's need to frequently change his position. As such, they did not consider all relevant factors necessary to make a judgment as to whether plaintiff could physically perform the light duty assignments in light of his need to constantly change his physical position.

Ultimately, however, we hold that there is no established full-time light duty position in the City of Harvey police department and, if there is such a position, it was created solely for the purpose of depriving plaintiff of his pension. The Board asserts, however, that Inspector Linkus' testimony supports the conclusion that an assignment to light duty could be permanent if an injured officer was never authorized by his physician to return to full duty. During the hearing, Linkus testified that injured officers are placed on light duty until their physicians release them. In response to a question from the Board's attorney as to whether an officer would be permanently assigned to light duty if never released back to full duty by his physician, Linkus responded "that's right." This affirmative response by

Inspector Linkus to a leading question by the Board's attorney is hardly sufficient to nullify all the evidence to the contrary and to establish that a full-time light duty position exists. Other than this statement by Linkus, the record is devoid of any such evidence. In fact, the evidence in the record is clearly to the contrary.

As the trial judge noted, the light duty position of "Police Officer Assigned To Station Duties" was created soon after plaintiff first requested a hearing on his pension. The job description combines the duties of records clerk and radio dispatcher. Both these positions are full-time positions which are held by civilians, not by police officers. Additionally, no injured officer has ever been permanently assigned to light duty. Moreover, permanently injured officers, such as plaintiff, are pensioned off. It is clear that in the City of Harvey police department light duty is a temporary, though often indefinite assignment, which officers with relatively minor injuries are assigned to *until* they recover.

The Board analogizes to *Peterson v. Board of Trustees of the Firemen's Pension Fund* (1973), 54 Ill. 2d 260, 262, 296 N.E.2d 721, 722, in which a fireman was permanently injured in the line of duty and, as a result, unable to return to his previous duties as a firefighter. The pension board denied his application for a disability pension, however, because there existed in the fire service "necessary duties within the fire-prevention bureau of the fire department which can be performed by a person of the physical and mental capacities of [claimant]." (*Peterson*, 54 Ill. 2d at 262, 296 N.E.2d at 722-23.) The difference between *Peterson* and the instant case is clear. In *Peterson*, the position available to the claimant was a necessary, established and existing full-time position in the fire department which, even with his disability, he was able to fully perform in accord with the established requirements of the position. In this case, although it is common to assign injured officers to temporary light duty work assisting the records clerk and the radio dispatcher, there has never existed in the City of Harvey a full-time light duty position.

The facts of this case force us to ask the obvious question, "If this plaintiff is not fully disabled from performing any kind of work, then who would be?" As the trial judge succinctly stated:

"[T]his applicant must be able to change his position with great regularity. He must be able to sit when he wants to sit; he must be able to stand when he wants to stand. He must be able to lie down to alleviate spasms and discomfort. He must be able to do those things not on the command or wish of someone else, but at his own motivation. If that is not total incapacity

for any kind of job, then I don't know what total incapacity would be."

Several illustrative examples of the work for a police officer assigned to station duties include among others receiving telephone calls, dispatching police personnel by radio, monitoring calls for fire fighting and ambulance equipment, and typing, filing and assembling records and reports. These are important positions and we do not intend to belittle them, but almost anyone would be able to physically do the majority of the jobs listed in the job description "Police Officers Assigned To Station Duties." If a police officer is injured in the line of duty and, as a result loses the use of both his legs, will the City of Harvey police pension board refuse to give him a "line of duty" disability pension if he requests one because he is still able to fulfill the duties of an officer assigned to station duties and permanently assist the records clerk and the radio dispatcher, receive telephone calls, dispatch police personnel or type? This is absolutely ludicrous, yet absolutely conceivable under the Board's apparent standards. Additionally, there is evidence in the record that several officers on pension are not nearly as disabled as plaintiff. Officer Blecken hurt his knee and is now driving a truck while getting a pension. Officer McCarthy is receiving a pension yet is still physically able to work as an investigator for the State's Attorney. It is hard to believe that neither of these injured officers could do "permanent" light duty.

Therefore, for the abovestated reasons, we conclude that the Board's decision to deny plaintiff a disability pension because there existed an established light duty position he could perform was not only the result of bias, but also was against the manifest weight of the evidence. As such, we affirm the circuit court's decision.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and MANNING, JJ., concur.