THIRD DIVISION

November 1, 2000

(
NUNC
 
PRO
 
TUNC
 September 29, 2000)

No. 1--99--0043

JAMES COMITO, JR. and MATTHEW THIEL, ) Appeal from the

) Circuit Court of

Plaintiffs-Appellants, ) Cook County.  

)

)

)

POLICE BOARD OF THE CITY OF CHICAGO, ) 

former Superintendent MATT RODRIGUEZ, )

former Interim Superintendent JOHN )

TOWNSEND, and Superintendent TERRY )

HILLARD, ) Honorable 

) Lester Foreman,

Defendants-Appellees. ) Judge Presiding.

JUSTICE BURKE delivered the opinion of the court:

Plaintiffs James Comito and Matthew Thiel appeal from an order of the circuit court denying their petition for administrative review of a decision by defendant Police Board of the City of Chicago (Board) terminating their employment as Chicago police officers for violating various department regulations.  On appeal, plaintiffs contend that the dismissal of their petition for administrative review and the Board's decision 
should be reversed because: (1) the hearing officer was biased or prejudiced against plaintiffs, denying them due process at the initial administrative hearing; (2) the hearing officer exceeded his statutory authority in posing questions to numerous witnesses; (3) the hearing officer erred in allowing defendants to call an expert witness and introduce scientific (DNA) evidence since the witness and evidence had not been disclosed until after the start of the hearing; (4) the Board's decision was against the manifest weight of the evidence; and (5) the trial court erred in denying plaintiffs' motion to take the depositions of certain Board members to determine whether they received and reviewed documents prejudicial to plaintiffs, prior to rendering their decision, which should not have been included in the record.  For the reasons set forth below, we affirm.  

On October 20, 1997, defendants filed charges against plaintiffs, alleging violations of various Chicago police department rules and regulations based on an altercation with Jeremiah Mearday on September 26, 1997, on North Pulaski Avenue in Chicago.  Plaintiffs were charged with violating department regulations prohibiting the following: conduct that impedes the department from achieving its policies and goals or that brings discredit upon the department; disrespecting any person; and making a false report.  Thiel was also charged with violations of regulations prohibiting engaging in unjustified verbal or physical altercations with any person and unlawful or unnecessary use or display of a weapon.    

On December 15, 1997, a hearing was initiated on the charges before the Board's hearing officer, Michael Berland.  The hearing was conducted on several dates, ending on January 20, 1998.  Thiel testified that on September 26, 1997, he and Comito were driving in a marked police car when they saw four black males standing near a corner at 1306 North Pulaski in Chicago at approximately 10:15 p.m.  He recognized two of the males, Tyrice and Andrew Harkins, one of whom he had arrested "for drugs."  Thiel then stopped the car in a lane of oncoming traffic and got out of the car.  Thiel instructed the males to approach the car and one of them "strolled away."  Thiel then drew his weapon and pointed it at the individual who would not stop because he could not see the individual's hands and he was afraid for his safety, knowing that there had been prior police shootings in the area.  Thiel ordered the individual to stop and to let him see his hands.  The individual eventually stopped, turned around, and told Thiel, "You better put that fucking gun away." Thiel denied that the individual explained that he was going to Walgreen's for medication at that time.  Thiel later learned that the individual was Jeremiah Mearday.  

Thiel further testified that he and Comito then approached Mearday because he was being evasive.  Comito placed his hand on Mearday's shoulders and asked him to come over to the car to talk for a couple of minutes, and Mearday shoved Comito's hand away from him and stated, "You got no fucking reason to stop me."  Comito told Mearday he was under arrest and grabbed him.  Mearday then began punching Comito and yelling obscenities.  Thiel then assisted Comito in trying to grab Mearday to take him into custody as Mearday continued to resist and shove them.  Thiel's flashlight was in the police car at that time.  Thiel jumped onto Mearday and, when they fell, Mearday's face struck the pavement, making a loud "snapping noise."  Thiel saw Comito give "two whacks" on Mearday's head with his baton while Mearday was lying with his back on the street, kicking and punching at them.  Thiel stated that he was standing over Mearday to his side, trying to put handcuffs on him.  Comito was standing on the other side of Mearday, also trying to gain custody of him.  They were able to flip him over and cuff his hands behind his back.  They placed him in the back of their police car and drove him to a firehouse because he was injured in the mouth and bleeding.  They called their sergeant to the firehouse, and the sergeant spoke with Mearday after he arrived.  Comito also testified, and his testimony was substantially similar to Thiel's. 

Kenneth Pfoser, a forensic biologist for the Illinois State Police, testified as an expert.  He stated that he examined plaintiffs' flashlights for the presence of blood in the crime lab.  He found blood near the "on/off" switch on one of the flashlights measuring 1½" by 1½".  He did not perform any test to determine to whom the blood belonged, and although he did not believe the blood came from a "splatter," he could not determine how the blood came in contact with the flashlight.   

[Nonpublishable
 material removed under Supreme Court Rule 23].

Jose Alicea, testified that shortly after he returned to his home at 1314 North Pulaski on September 26, 1997, at approximately 10 p.m., he heard someone scream from outside.  When he looked out his window, he saw a person, whom he later learned was Mearday, lying on the ground with his head over the sidewalk and the rest of his body in the street.  He saw a police officer with dark hair on top of Mearday with the officer's hand over Mearday's neck.  He also saw a blond-haired officer then strike Mearday twice on the back of his head with either a baton or a flashlight.  He did not personally know Mearday at the time of this incident.  His window was closed and approximately 10 feet from the officers' location on the street.  Two other black youths were also standing near the scene.  The officers placed Mearday in the police car and drove north on Pulaski.  After the incident, Alicea noticed blood on the ground.  The following morning he also noticed that the right turn signal of his car, which had been parked in front of his house, was broken and there was a scratch on the car.  He was aware that his block was a drug dealing location and that it is a border between the Disciples and Vice Lords street gangs.   

Alicea admitted on cross-examination that he had previously told an "OPS" investigator that he saw the blond-haired officer strike Mearday twice with half-

swings with the light end of a flashlight.  He also stated that Mearday was struck on the back of his head at an area about level with the ear.   

[Nonpublishable
 material removed under Supreme Court Rule 23].

Pedro Delostrinos, a physician, testified that he treated Mearday on September 26, 1997, in the emergency room at Norwegian Hospital at 10:45 p.m.  Mearday told him that a police officer beat him and hit him in the face with a flashlight.  Delostrinos examined the scalp lacerations on Mearday and tried to see the bleeding in his mouth.  Mearday tested negative for alcohol, but his blood did reveal evidence of marijuana use.  Delostrinos contacted the Cook County Trauma Unit to see if they would accept Mearday because Norwegian Hospital did not have doctors available to treat Mearday's maxilla (mouth) injuries.  Delostrinos further testified that he believed that Mearday's injuries were consistent with being hit by a flashlight or any hard object.  He did not observe any dirt on Mearday's nose or mouth.  Mearday never mentioned to Delostrinos that he was suffering from an allergic reaction, and the doctor did not notice any evidence of a rash or skin discoloration.  He also saw that five of Mearday's teeth were hanging loose from the alveolar socket.  He further stated that such an injury could be caused by contact with the street.  Reading from the medical history of Mearday listed on one of his medical records, Delostrinos noted that "shrimps" were listed under allergies.   

Jeremiah Mearday testified that at approximately 9:15 p.m on September 26, 1997, he began having an allergic reaction after waking up and eating some shrimp fried rice at his father's house.  He saw a group of his friends and asked them to walk to Walgreen's with him to purchase some medication because he did not feel safe walking in the area alone.  Betts, Moore, and Harkins began to walk with him north on Pulaski.  Mearday was walking 10 to 20 yards ahead of his friends because his neck was "itching real bad."  The group saw a police car pull onto Pulaski, and two police officers "jumped" out of the car and "onto" his three friends.  Mearday continued walking and then heard a voice say, "You run I'm going to shoot your ass."  When he turned around, he saw a white, "gold-

haired" officer pointing a gun at him.  He then began to drop to his knees with his hands in the air when the first officer's partner with dark hair began running toward him and struck him on the top of his head with a flashlight.  Mearday claimed that he balled-up, fell to his side, and tried to "cover up."  He stated that he was struck by both officers, but he did not know the number of times they hit him.   

Mearday further testified that each officer took one of his hands and began to lift him up to a standing position until he was leaning against a car, and they continued to hit him with their flashlights.  After he screamed for his father, Thiel hit him across his mouth with a flashlight knocking his teeth back into his mouth.  He then fell over the car, landing on his hands and knees, and the officers began hitting him on the head again.  The officers then handcuffed him and started kicking him again before putting him in the back of the police car.  The officers never informed him of the reason they stopped him.  Mearday then described the injuries he suffered. 

Mearday also testified that while he was sitting in the police car at the firehouse, he heard plaintiffs indicating that they were going to report that he was "resisting arrest and trying to get tough."  When a sergeant questioned him at the firehouse, he stated that plaintiffs had beaten him for no reason with their flashlights.  The sergeant then closed the police car door in his face and told him that he was going to jail.  Mearday also offered explanations for two portions of a prior statement he had made to the OPS investigator.  First, he indicated that the reference to a "stick," rather than a flashlight, in the statement was a misunderstanding on the part of the investigator because of the condition of his mouth at the time he gave the statement.  He also stated that he mistakenly mentioned his friend "Boo," Joseph Eistman, as one of his friends present during the beating when he should have added Harkins.  Mearday further stated that he never struck nor resisted the officers.  On cross-examination, Mearday admitted that his friend Harkins had an outstanding warrant for his arrest on the night of the incident.  

On January 8, 1998, approximately three weeks after the hearing had begun, defendants called Dr. John Flaherty, who was board certified in internal and emergency medicine, as a witness.  Plaintiffs had filed a motion to bar Flaherty from testifying because he and his opinions had not been timely disclosed as a witness.  The hearing officer denied plaintiffs' motion, and plaintiffs rejected the offer of a continuance in order to prepare for Dr. Flaherty's testimony.  After Flaherty was qualified as an expert, he testified that the two injuries to the top of Mearday's head were caused by one or two blows from a blunt object consistent with a police baton and the injury to Mearday's face between his nose and lip was also caused by a blow from a blunt object such as a flashlight or gun.  It was also Flaherty's opinion that the injuries were not consistent with having been caused by a fall onto the pavement or a flat surface.  On cross-

examination, Flaherty stated that he was first consulted regarding the case in the second or third week of December 1997.    

On January 12, 1998, the hearing officer granted a motion filed by the State's Attorney's office seeking a copy of the testimony of the civilian witnesses during the hearing to be used in the State's Attorney's own investigation into police brutality.  The State's Attorney was ordered not to turn the transcript over to any other person without further order of the hearing officer or the circuit court.    

Hearing officer Berland subsequently submitted his "Findings and Recommended Decision" in the case and, on March 12, the Board adopted Berland's findings and recommended decision and announced that plaintiffs had been found guilty of the charges and that they were discharged.  The Board issued a 39-page "Findings and Decision."  On March 16, plaintiffs filed a petition for administrative review in the circuit court.  

Thereafter, plaintiffs filed a motion to strike certain exhibits from the administrative record filed by defendants in the trial court.  They argued that of several exhibits from the hearing that had been marked for identification only and not admitted into evidence, three exhibits were prejudicial to their position and had been wrongfully included in the record that was distributed to the Board members.  Plaintiffs also sought leave to depose members of the Board to determine whether they received the exhibits when considering the evidence.  Defendants agreed to have the exhibits stricken from the administrative record, but opposed the taking of depositions of Board members, arguing that the inclusion of the exhibits in the administrative record before the trial court was a mistake, but that the Board members never received them.  On July 24, 1998, the trial court allowed plaintiffs to take the deposition of the Board's administrative assistant, Mark Iris, pursuant to plaintiffs' motion.   

On September 17, 1998, the trial court then allowed plaintiffs request to take the depositions of four members of the Board, but denied their request to take hearing officer Berland's deposition.  Prior to taking the four members' depositions, defendants filed a motion for reconsideration of the trial court's order allowing the depositions.  On October 5, the trial court granted defendants' motion and vacated its order granting plaintiffs' request to take the depositions of the Board members.  The trial court stated in its ruling that its duty in an administrative review action was limited to review of the record created in the administrative proceedings and that to allow the depositions would "creat[e] something over and above the existing record of the administrative review.    

On December 9, 1998, a hearing was held on plaintiffs' petition for administrative review.  The trial court denied plaintiffs' petition, finding that the decision of the Board was not against the manifest weight of the evidence and that the numerous citations to the record made by plaintiffs did not support their contention that the hearing officer was biased against them or that they had received an unfair hearing.  This appeal followed. 

Plaintiffs contend that they were denied a fair hearing and due process of law before the Board.  Plaintiffs claim that hearing officer Berland's "continued insistence on interrupting counsel, questioning every witness, advising counsel and witnesses for the superintendent, and commenting on the evidence" proved that Berland was biased against them and constituted reversible error.  They cite 105 examples from the transcript of the hearing in support of this argument.  Plaintiffs further argue that Berland's conduct in questioning nearly every witness at the administrative hearing exceeded his statutory authority.  They claim that his questions were typically one-sided and designed to benefit the superintendent's position and, if not illegal, then the questions were unfair.  Plaintiffs also maintain, without citing to authority, that Berland similarly exceeded his statutory authority when he permitted "third party practice" during the hearing by addressing motions brought by the State's Attorney's office and by attorneys for Mearday and Leron Betts, a witness at the hearing, who were not parties to the Board proceeding.  Plaintiffs claim that Berland also improperly refused to enforce their subpoena to Mearday to require Mearday to testify during the presentation of their case in chief.  

Defendants contend that plaintiffs received the due process they were entitled to in an administrative hearing and that Berland did not exceed his statutory authority in conducting the hearing.  Defendants argue that plaintiffs failed to provide evidence sufficient to overcome the presumption that Berland, as the hearing officer, acted with "honesty and integrity" in conducting the evidentiary hearing.  They further claim that many of the 105 incidents cited by plaintiffs were merely evidentiary rulings made within the hearing officer's discretion and that plaintiffs' cursory argument and absence of citation to authority against these rulings acts as a waiver of their objections.  Defendants further argue that allegedly erroneous findings and rulings were insufficient to show that the fact finder harbors personal bias or prejudice against plaintiffs.  Defendants also note that plaintiffs failed to make objections to most of the incidents raised in plaintiffs' brief, constituting a waiver of this issue on appeal.  Defendants maintain that plaintiffs only objected to four instances that plaintiffs have cited in the record.  Defendants also contend that the statutory authority allowing the Board to "conduct disciplinary hearings" and to "receive relevant evidence" is broad enough to authorize the hearing officer to question witnesses and is consistent with the long recognized judicial authority to pose such questions.  They further argue that the hearing officer did not have statutory authority to either enforce or quash plaintiffs' subpoena to Mearday and that the hearing officer properly refused to compel Mearday to testify a second time.  Defendants also claim that the subpoena was also invalid because it had not been accompanied by a witness or mileage fee.  

On judicial review of an administrative determination, the function of the circuit court is not to reweigh the evidence, but merely to determine if the conclusion is against the manifest weight of the evidence.  
Collura v. Board of Police Commissioners of the Village of Itasca
, 113 Ill. 2d 361, 372-73, 498 N.E.2d 1148 (1986).  This deferential standard is not controlling where the Board is prejudiced or biased against the claimant and incapable of giving him a fair hearing.  
Danko v. Board of Trustees of the City of Harvey Pension Bd.
, 240 Ill. App. 3d 633, 641, 608 N.E.2d 333 (1992).  In order to establish bias of an administrative decision maker, a claimant must show more than a mere possibility of bias.  
Collura
, 113 Ill. 2d at 370.  If one decision maker on an administrative body is not completely disinterested, his participation infects the action of the whole body and makes it voidable.  
Danko
, 240 Ill. App. 3d at 642.  Where an administrative agency is engaged in an adjudicatory capacity, bias or prejudice may be shown if a disinterested observer might conclude that the administrative body, or its members, had in some measure adjudicated the facts as well as the law of the case in advance of hearing it.  
A.R.F. Landfill v. Pollution Control Bd.
, 174 Ill. App. 3d 82, 89, 528 N.E.2d 390 (1988).  Administrative officials are presumed to be objective and capable of fairly judging a particular controversy.  
A.R.F. Landfill
, 174 Ill. App. 3d at 89. 

It is a constitutional right that no State may deprive a person of life, liberty or property without due process of law.  U.S. Const., amend.  XIV; Ill.  Const. 1970, art.  I, §2.  The essence of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.  See 
Northern Illinois Home Builders Ass'n v. County of DuPage
, 165 Ill. 2d 25, 45, 649 N.E.2d 384 (1995).  Administrative proceedings are governed by the fundamental principles and requirements of due process of law.  
Abrahamson v. Illinois Department of Professional Regulation
, 153 Ill. 2d 76, 92, 606 N.E.2d 1111 (1992).  However, "procedural due process in an administrative proceeding does not require a proceeding in the nature of a judicial proceeding, *** but is satisfied by a form of procedure that is suitable and proper to the nature of the determination to be made and conforms to fundamental principles of justice."  
Telcser v. Holzman
, 31 Ill. 2d 332, 339, 201 N.E.2d 370 (1964); 
Valdez v. Zollar
, 281 Ill. App. 3d 329, 336, 665 N.E.2d 560 (1996) (due process is a flexible concept which requires different levels of protection depending on the level of protectable interest at stake; the more significant the property interest, the more process is due)
.  "An administrative body possesses broad discretion in conducting its hearings."  
Village of South Elgin v. Pollution Control Bd.
, 64 Ill. App. 3d 565, 568, 381 N.E.2d 778 (1978).  However, this discretion must be exercised judiciously and not arbitrarily.  
Wegmann v. Department of Registration & Education
, 61 Ill. App. 3d 352, 356, 377 N.E.2d 1297 (1978).  All that is required is that "the procedures be tailored, in light of the decision to be made, to the capacities and circumstances of those who are to be heard, to insure that they are given a meaningful opportunity to present their case."  
Telcser
, 31 Ill. 2d at 339.  A fair hearing before an administrative agency must include the opportunity to be heard, the right to cross-examine adverse witnesses, and impartial rulings on the evidence.  
Abrahamson
, 153 Ill. 2d at 95.  

Section 2--84--030 of the Chicago Municipal Code provides:  

"Hearing officers shall conduct disciplinary hearings in accordance with the provisions of the chapter and the rules of procedure established by the Police Board.  The hearing officer may take judicial notice, rule on offers of proof, receive relevant evidence during the hearing and certify the record and make findings of fact, conclusions of law and recommendations to the Police Board following the hearing."  Chicago Municipal Code 2-

-84--030 (1999).

The circumstances of each case determine the propriety of judicial examination of a witness and rests largely in the discretion of the trial court.  
People v. Brown
, 200 Ill. App. 3d 566, 576, 558 N.E.2d 309 (1990).  The trial judge has discretion to question witnesses in order to elicit the truth or to clarify material issues which seem obscure.  
Brown
, 200 Ill. App. 3d at 576.  It is not the province of the trial judge to convey, by either words or actions, his opinions relative to determinations of fact, credibility of witnesses, and weight to be afforded witnesses' testimony.  
People V. Mays
, 188 Ill. App. 3d 974, 983, 544 N.E.2d 1264 (1989).  

Plaintiffs here make two arguments regarding the questions posed to witnesses by the hearing officer: (1) that such questions exceeded the hearing officer's statutory authority and (2) that such questions were evidence of the hearing officer's bias against plaintiffs and were unfair.  With respect to plaintiffs' first argument, neither party cites any authority directly on point with the facts of this case, but they both rely on the language of section 2--84-

-030 of the Chicago Municipal Code.  Although plaintiffs are correct that this section does not explicitly grant the hearing officer the authority to pose direct questions to witnesses, that authority is also not explicitly prohibited.  The powers referred to in section 2--84--030 are all consistent with the functions of a judge in a judicial proceeding: taking judicial notice, ruling on offers of proof, receiving evidence presented at the hearing, and making findings of fact and conclusions of law.  As indicated in the cases cited above, judges are permitted to pose questions to witnesses in conjunction with performing such functions, especially in situations where the judge is the trier of fact and a jury is not present.  

Here, there is no similar concern, as in 
Mays
, of a trial judge conveying his opinions regarding the credibility of the witnesses and the weight of the evidence to the jury because the hearing officer is both the judge of the facts and the law under the Chicago Municipal Code.  Additionally, based on the authority granted to the hearing officer in the section at issue, the ability to pose his own questions to witnesses would seem consistent, and in some cases necessary, with that authority.  Plaintiffs have not cited any authority in support of their argument that such questions are prohibited.  The Code gives the hearing officer broad powers to conduct the hearing, and we find that asking questions of witnesses to clarify issues is consistent with this power.  

With respect to plaintiffs' second argument that such questions, even if appropriate, demonstrate the hearing officer's bias against them, the record demonstrates that plaintiffs failed to raise objections to the vast majority of the questions posed by the hearing officer as well as to his evidentiary rulings.  Despite a general, brief description of these instances and a citation to the record, plaintiffs do not explain how these instances were specifically prejudicial to them or unfair.  Additionally, plaintiffs have failed to cite to any authority holding that any of these specific instances are evidence of bias or prejudice.  Plaintiffs merely suggest that this court should "consider some" of the instances cited in addressing this issue.  This court has held that it is unfair for a petitioner to wait and learn whether he or she has obtained a favorable result at the administrative hearing before raising the issue of bias or prejudice.  See 
Waste Management of Illinois, Inc. v. Pollution Control Bd.
, 175 Ill. App. 3d 1023, 1035, 530 N.E.2d 682 (1988).  Plaintiffs' counsel only made four objections to the 105 instances raised, and plaintiffs therefore waived this issue on these grounds as well. 

Even assuming that plaintiffs have not waived this issue, none of the instances cited by plaintiffs suggest that the hearing officer had a particular bias or prejudice against plaintiffs.  Having reviewed the 105 instances of alleged bias in the transcript of the hearing, we find that while the record shows that the hearing officer took an active role during the hearing, the hearing officer's questions, comments, and rulings would not indicate to a disinterested observer that the hearing officer had already adjudicated the facts or the law prior to the hearing.  As we stated above, there is a presumption that the hearing officer was objective and capable of fairly judging this controversy, and plaintiffs have failed to defeat this presumption.  We also note that the Board and its hearing officer have discretion to conduct the hearing, and there is no evidence to support plaintiffs' argument that the mere number of comments or questions by the hearing officer is an indication that he was biased, prejudiced, or unfair.  The hearing officer did not prevent plaintiffs from presenting their own evidence and argument or cross-examining witnesses.  The transcript of the proceedings, in fact, demonstrates that the hearing officer typically directed his own questions to a witness only after the parties had completed their direct and cross-examinations, and, thereafter, he would allow the parties additional questions if they desired.  Additionally, his questions often also helped develop the factual record by asking witnesses questions such as whether or not there were streetlights near the incident and where they were positioned.  Accordingly, plaintiffs' argument, that the 105 instances they complain of demonstrates the hearing officer's bias against them, fails.   

The cases relied on by plaintiffs, such as 
People v. Falaster
, 273 Ill. App. 3d 694, 653 N.E.2d 467 (1995), and 
Mays
, 188 Ill. App. 3d 974, are not on point and are criminal cases involving juries where there is more concern for a judge's examination of a witness because of the danger of the judge conveying his opinions on the issues of fact, the credibility of witnesses, and the weight of the testimony to the jury.  There is no similar concern here where the hearing officer was the judge of the law and the facts at the hearing.  See also 
Brown
, 200 Ill. App. 3d at 576-77; 
People v. Rush
, 250 Ill. App. 3d 530, 536,  620 N.E.2d 1262 (1993).  

Plaintiffs next contend that the hearing officer wrongfully denied their motion to bar Dr. Flaherty from testifying and to quash the results of DNA tests that defendants sought to introduce at the hearing.  Plaintiffs argue that defendants' production of the results of the DNA tests on January 5, 1998 was not in compliance with the discovery rules because the trial had begun three weeks earlier, the reports indicated that a member of the superintendent's staff had received the results 24 days earlier, and the tests were not ordered by OPS, the division responsible for investigating such cases pursuant to Police Department General Order 93--3.  Plaintiffs further argue that the superintendent ignored the language of Police Board Rule of Procedure II which states that plaintiffs were entitled to the results or reports of scientific tests performed in connection with a case to be granted a hearing.  

Defendants argue that plaintiffs misread the police department's discovery rule, claiming that the rule instead states that the superintendent is required to disclose scientific tests or experiments made in connection with a particular case which are in the "custody and control" of the police department.  They further claim that they did not receive the results of the DNA test, which examined the blood found on one of plaintiffs' flashlights, until December 23, 1997, and plaintiffs' attorneys were "promptly" informed of the results.  Defendants maintain that the discovery rule does not prevent the superintendent from presenting evidence "it receives after the discovery date where the evidence is plainly relevant to the underlying charges and has been disclosed to opposing counsel."   Defendants alternatively argue that even if there was a discovery violation, plaintiffs have not shown why the hearing officer's failure to exclude the evidence was an abuse of discretion.  They argue that there is no rule requiring the exclusion of evidence under such circumstances and that plaintiffs cannot claim surprise or prejudice since they knew of the presence of the blood on the flashlight and could have obtained their own expert.  Defendants further argue that plaintiffs were aware that the tests were being conducted and were informed of the results shortly after the superintendent received them.  

Section 2--84--030 of the Chicago Municipal Code provides, in relevant part:

"The police board shall establish the rules of procedure not inconsistent with this section respecting notice of charges and the conduct of the hearings before the police board ***.  The police board, or any member or hearing officer designated by it, is not bound by formal or technical rules of evidence, but hearsay evidence is inadmissible.  The person against whom charges have been filed *** shall have the right to be confronted by his accusers; may cross-examine any witness giving evidence against him; and may by counsel present witnesses and evidence in his own behalf."  Chicago Municipal Code 2--

84--030 (1999).

The "Rules of Procedure" of the Board under section II, entitled "Pre-

Hearing Motions and Discovery," provides:

"A. Prior to the hearing on charges filed with the Board, the respondent upon written request made prior to the hearing and filed with the Secretary of the Board and the Office of the Corporation Counsel, shall be entitled to *** 5.) results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case which are within the custody or control of the Department of the Police ***."  

Administrative rules and regulations have the force and effect of law, and must be construed under the same standards which govern the construction of statutes.  
Northern Illinois Automobile Wreckers & Rebuilders Ass'n v. Dixon
, 75 Ill. 2d 53, 58, 387 N.E.2d 320 (1979).  The determination of whether particular evidence is relevant is within the discretion of the trial court and will not be disturbed absent an abuse of discretion.  
McCleary v. Board of Fire and Police Commissioners of the City of Woodstock
, 251 Ill. App. 3d 988, 994, 622 N.E.2d 1257 (1993).  

Neither party has cited to pertinent authority to support their argument.  The hearing officer indicated that he was not aware of any rules or regulations requiring defendants to disclose all of their witnesses prior to the start of the hearing in order to present the witness during the hearing.  Additionally, as stated above, the Chicago Municipal Code empowers the hearing officer to receive evidence, but it does 
not bind him by the formal or technical rules of evidence except that hearsay is inadmissible.  Based on this record, we find that the hearing officer did have discretion to permit Dr. Flaherty to testify even though he was not disclosed to plaintiffs until after the hearing began.  

There is some dispute between the parties and it is not clear from the record exactly when plaintiffs received initial notice of the DNA test results and the identity of Dr. Flaherty, but defendants admit that they did not receive the test results until after their initial disclosure of materials to plaintiffs and the beginning of the hearing in December 1997.  Plaintiffs apparently did not learn of the test results until early January 1998 shortly before defendants intended on having Dr. Flaherty testify as their expert.  Neither the rules of the Board nor the Municipal Code contains an absolute prohibition against the admission of such evidence obtained following the investigation of the charges and the start of the hearing.  Even if untimely here, the hearing officer did have discretion to admit such evidence and the formal and technical rules of evidence are not applied to these proceedings.  Additionally, the record reveals that the hearing officer recognized plaintiffs' concern over the late disclosure and offered plaintiffs a continuance in order to properly prepare a cross-

examination of Dr. Flaherty and the DNA evidence.  Plaintiffs refused this offer.  In the absence of any authority to the contrary, the record here indicates that the hearing officer did not abuse his discretion in admitting this evidence, particularly in light of the less formal evidence rules applicable to the hearing.  

[Nonpublishable
 material removed under Supreme Court Rule 23].

Plaintiffs next contend that the trial court erred in granting defendants' motion to reconsider the order allowing them to depose four of the Board members.  They argue that they should have been allowed to take the depositions to support their argument that the administrative record received by the Board improperly contained documents that were not admitted into evidence at the hearing and that were prejudicial to plaintiffs.  Although plaintiffs do not cite to any legal authority in support of their argument, they maintain that they were faced with an impossible burden to prove this argument if they were not allowed to conduct some discovery in the administrative review action because there are no records of the Board's deliberations.   

Defendants argue that the trial court did not err in refusing to allow new evidence through the depositions of the Board members in the administrative review action.  They contend that the Administrative Review Law does not permit such new or additional evidence in opposition to the Board's findings and that the trial court's review was limited to the record before the Board.  Defendants also point out that the Administrative Review Law does permit the trial court to remand a matter to an agency for an additional hearing if the record requires further development, but they also argue that plaintiffs failed to seek this remedy in the  trial court.  Alternatively, defendants argue that plaintiffs' allegations that improper materials were sent to Board members is speculative and that plaintiffs have also failed to demonstrate, even if such materials were sent, how they were prejudiced.  

 When reviewing the decision of an administrative agency, this court is limited to reviewing the record which was before the agency and may not consider "new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency."  735 ILCS 5/3--110 (West 1998); 
Abrahamson
, 153 Ill. 2d at 88.  The Administrative Review Law does permit a reviewing court discretion to remand the case back to the agency for further development of the record, if necessary.  735 ILCS 5/3--111 (West 1998). 

 Plaintiffs have not cited to any pertinent authority in support of their argument that they should have been allowed to conduct the depositions of Board members to resolve the alleged issue of what evidentiary materials were reviewed by the Board members.  We find that the trial court would have improperly admitted additional evidence by allowing the depositions, in violation of the general rule prohibiting the trial court from considering new or additional evidence in an action to review the decision of an administrative agency.  The record indicates that plaintiffs did not request that the trial court remand the case back to the administrative agency for further development of the record.  It is well settled that if a party fails to raise an issue in the trial court, it may not be raised for the first time on appeal.  
Illinois Life and Health Insurance Guaranty Ass'n v. Boozell
, 289 Ill. App. 3d 621, 628, 682 N.E.2d 291 (1997).  

[Nonpublishable
 material removed under Supreme Court Rule 23].

For the reasons stated above, we affirm the order of the circuit court dismissing plaintiffs' petition for administrative review.  

Affirmed.

CERDA and WOLFSON, JJ., concur.