LARRY COYNE, Plaintiff-Appellant, v. MILAN POLICE PENSION BOARD, By its President, David Jones, *et al.*, Defendants-Appellees.

Third District   No. 3—03—0066

Opinion filed April 13, 2004.

David W. Andich (argued), of Andich & Andich, and G. Trent Marquis (argued), of Klockau, Marquis & Skorepa, P.C., both of Rock Island, for appellant.

Richard J. Reimer, Thomas S. Radja, Jr., and Richard J. Puchalski (argued), all of Richard J. Reimer & Associates, L.L.C., of Hinsdale, for appellee Milan Police Pension Board.

John H. Kelly (argued), of Ottosen, Trevarthen, Britz, Kelly & Cooper, Ltd., of Wheaton, for appellee Village of Milan.

PRESIDING JUSTICE HOLDRIDGE delivered the opinion of the court:

Appellant, Larry Coyne, worked as a police officer in the Milan police department until November of 1995. In March of 1996 he filed an application with the Milan Police Pension Board (the Board) requesting a line-of-duty disability pension (40 ILCS 5/3—114.1 (West 1996)), or alternatively, a nonduty disability pension (40 ILCS 5/3—114.2 (West 1996)). The Board denied both requests, and the Rock Island County circuit court affirmed the Board's decision. Coyne then

filed this appeal. We affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

In 1990 Coyne submitted to a psychological evaluation by Doctor Rip O'Keefe to determine his fitness for a promotion to the rank of police sergeant. Doctor O'Keefe indicated that, from a psychological standpoint, Coyne was sound and suffered no impediments that would hinder his performance as a sergeant. Coyne received the promotion.

After he filed his application for pension benefits, the Village of Milan (the Village) petitioned to intervene in the proceedings. The Village cited two bases for intervention: an interest in the expenditure of its pension funds; and a similarity between the facts of Coyne's claim and the facts of a pending grievance filed by the police union on his behalf. The Village's petition to intervene was granted.

The pension hearing occurred in June of 1998. At the outset of the hearing, Coyne's counsel raised a conflict-of-interest issue because two of the Board's members held other positions with the Village. The challenged board members were Don Wall (village trustee) and Barbara Lee (elected village clerk). Counsel asked Wall and Lee to recuse themselves, stating that he was not questioning their impartiality but merely asserting a "legal question" he felt obligated to raise. Ensuing discussions revealed that Wall had voting power on the Village's taxing authority the Village used to generate pension funds; however, Lee had no financial decision-making power for the Village. Wall voluntarily recused himself, but Lee declined to step down.

In response to pointed questioning, Lee affirmed that: she was capable of rendering a fair and impartial decision based solely on the evidence presented at the hearing; she harbored no preconceived notions and had not judged the case beforehand; and her position as village clerk, in combination with the Village's status as an intervener, would not influence her decision in any way. The Village's attorney advised that the Board had no authority to disqualify Lee from service. Although Coyne's counsel persisted in his conflict-of-interest objection, he agreed to proceed with Lee on the Board. Counsel again explained that his objection was not directed at Lee personally; rather, he believed recusal was appropriate "just by [her] position."

The first witness to testify at the hearing was Dennis Baraks, chief of police in the Milan police department. Baraks said Coyne's job performance began declining in late 1994 or early 1995. Before that time, Coyne exhibited no problems and performed above-average work. The first sign of problems occurred when Baraks requested an explanation for Coyne's excessive speed while driving his squad car. According

to department records, Coyne was responsible for 80% of the instances where an officer drove above 80 miles per hour. Upon receiving the request, Coyne "charged into [Baraks'] office" and claimed he deserved special consideration because he performed the most work in the department. Baraks acknowledged that Coyne had been "very active" on the police force and was extremely dependable in high-stress situations. However, after their confrontation on the speeding issue, Coyne became sullen, unreceptive to personal conversation, vindictive, and hostile.

In May of 1995 Baraks wrote a letter to Coyne expressing concern about his psychological fitness to perform police work. Baraks advised that Coyne's conduct was inappropriate and that he would be sent for a psychological evaluation if the conduct continued. The conduct did continue, and Baraks wrote another letter warning Coyne of a possible suspension or psychological review. In October of 1995 Baraks wrote a third letter advising Coyne: "[F]or the past year your conduct has been irrational." He noted that Coyne was performing his duties at a fraction of his ability.

Baraks testified that as of November 1995, he did not believe Coyne was fit for police duty. His primary concern was not how Coyne would perform in the field, but rather the negative effect Coyne's presence would have on the department internally.

Coyne was the only other witness to testify at the hearing. He said he suffered psychological impairment from being traumatized by several incidents at work. During one of the incidents, a drunk driver ran a red light in May of 1994 and hit the driver's door of Coyne's car. Coyne missed work for three months while recovering from injuries he sustained in the accident. During a second incident, an 18-year-old boy brandished a knife in March of 1995 and struggled with Coyne while trying to disarm his holstered service weapon. Realizing that his job could have required killing a teenager, Coyne became convinced that he was incapable of appropriately responding to violent acts (especially discharging his firearm). From that point on, he worked with no ammunition in his firearm. During a third incident, Coyne responded to a motor vehicle accident in November of 1995 where he crawled into an overturned car to assist a trapped motorist. He said the experience caused a flashback to his own accident with the drunk driver. While rescuing the motorist, he experienced extreme claustrophobia and had serious difficulty staying inside the overturned car.

In addition to these incidents, Coyne described several other traumatic experiences, including a canoe accident where two persons drowned, several suicides, and a motorcycle accident where a young man was killed. Coyne was good friends with the parents of the young

man who died in the motorcycle accident. He tried to perform cardio-pulmonary resuscitation at the scene, but on the first compression his hand broke through the young man's chest.

After the incident with the trapped motorist, Coyne went home and wrote a suicide note, laid out his funeral clothes, sat in the bathtub, and nearly shot himself while holding a loaded gun in his mouth. The next day he sought help from Doctor O'Keefe. He chose Doctor O'Keefe's office because the department had sent him there in 1990 for his sergeant's evaluation. The doctor suggested in-patient mental health treatment, but Coyne refused to be committed and instead commenced a course of outpatient treatment. He did not return to work.

Coyne testified that when he left active duty he was depressed and felt like everyone was "out to get [him]." He described himself as "a time bomb waiting to go off." His symptoms included sleeplessness, nightmares, inattentiveness, uncontrolled anger, a fluctuating appetite, loss of energy, and paranoid thoughts. He said his nightmares often involved replays of "ugly calls" and prior traumatic events on the job. Other dreams involved situations where he had to defend himself against an oncoming assailant. Sometimes in those dreams he could not pull the trigger on his weapon; other times, he pulled the trigger and then reached out to grab the bullet because he wanted it back.

According to Coyne, Doctor O'Keefe saved his life by helping him gain enough control to prevent him from harming himself or others. In addition to Doctor O'Keefe's psychological treatment, Coyne also received psychiatric treatment from Doctor G. Narayan. Both doctors advised him to leave police work and find a job where he could keep busy with accomplishable tasks. Accordingly, he acquired a truck and began driving as an independent contractor. He said truck driving satisfied the doctors' recommendation because it did not involve public interaction or high pressure. He simply picked up loads and dropped them off without any employee-supervisor relationship.

Coyne testified that he needed additional treatment from Doctor O'Keefe but could not afford it. He was $70,000 in debt from starting his trucking business, and the business was just breaking even. Additionally, his health insurance through the Village only covered 50% of the bills from his mental health treatment. He already had an outstanding balance of $2,500 to $3,000 with Doctor O'Keefe.

Coyne testified that his last visit to Doctor O'Keefe was sometime in 1997 and that he treated with Doctor Narayan through late 1997 or early 1998. He said he followed all the instructions the doctors gave him, and he was still taking prescription medication. Sometimes,

however, he did not take his medication because it made him feel "real blah." He said he was not capable of performing police work because he could not respond appropriately to stressful and violent situations.

In addition to written records from Doctors O'Keefe and Narayan, the evidence included records from three doctors appointed by the Board to evaluate Coyne. The doctors were Henry Conroe, Jonathan Kelly, and Richard Harris. The evidence also included a report from Doctor Eric Ostrov, whom Coyne visited on a referral from Doctor Kelly.

Doctor O'Keefe's records show that Coyne drafted three memoranda outlining numerous events leading to his psychological disability. The events ranged from disagreements with Chief Baraks to incidents where Coyne witnessed deaths. In January of 1996 Doctor O'Keefe wrote:

> "It is my opinion that Sgt. Coyne is currently unable to function as a police officer. He poses a significant risk to himself and to the well being of others. He is placed on medical leave from his employment as a police officer due to job related stress factors. I believe the Milan Police Department should proceed to evaluate Sgt. Coyne for a job related disability retirement."

Doctor O'Keefe's ultimate diagnosis was posttraumatic stress disorder stemming from "a series of work-related stressors" causing Coyne to "progressively deteriorate[ ] from his ability to do police work." The doctor advised that in all likelihood Coyne would never be able to resume such work.

Doctor Narayan also diagnosed Coyne with posttraumatic stress disorder and said: "It is further advisable that he can not return to his duties as a police officer [because] the renewed stress could be detrimental to his safety and the safety of other people." Commenting on the cause of Coyne's disorder, Doctor Narayan observed: "Mr. Coyne has gone through significant traumatic experiences through out [sic] ten years as a police officer."

Doctor Conroe diagnosed Coyne with major depressive disorder, describing his condition as "the cumulative effect of witnessing and experiencing events involving death, the threat of death or serious injury." The doctor further stated that Coyne could not control his emotions and judgment sufficiently to work as a police officer.

Doctor Kelly diagnosed Coyne with major depression, describing his condition as a "response to traumatic incidents he was exposed to on his job as a policeman." According to the doctor, Coyne was psychiatrically disabled from working as a police officer, but with proper treatment he could overcome his depression and resume such work.

Doctor Ostrov diagnosed major depression and stated that Coyne could not work as a police officer.

Doctor Harris opined that Coyne did not suffer from posttraumatic stress disorder and was not disabled from performing police work. In rendering this opinion, the doctor made multiple references to a conversation he had with Doctor O'Keefe. Doctor Harris' written report reads:

> "Sgt. Coyne does not have a severe impairment rendering him unable to perform the duties of a police officer. He had an acute problem which was treated quickly and successfully. He currently has no signs of the symptoms necessitating treatment in November 1995. His acute disorder was largely a function of long-standing problems in interpersonal relationships stimulated by the not infrequent, volatile quality of the manager-managee relationship."

Doctor O'Keefe reviewed Doctor Harris' report and responded with a letter reiterating his position that, "based upon many hours of treatment of Sgt. Coyne, \*\*\* he is disabled from police work and [the disability] is \*\*\* work-related." Doctor O'Keefe stated that Doctor Harris misse[d] the point" and "went out of his way to focus only on that information that proved his conclusion." He also said Doctor Harris reported their conversation accurately but not completely. In particular, Doctor Harris omitted Doctor O'Keefe's firm position that Coyne is disabled as a result of work-related activities and that the disability is complete and likely permanent.

Coyne testified that Doctor Harris was arrogant and obnoxious and that they "didn't hit it off" during his evaluation. He said they spent little time discussing his work-related incidents because the doctor's questions did not elicit that information. Rather, according to Coyne, Doctor Harris spent most of his time asking about sex (Coyne's sex life and the sex lives of his coworkers).

After considering the foregoing evidence, the Board denied Coyne's pension application. The Board specifically found that Coyne failed to prove: a disability rendering him incapable of performing police work (a necessary element for both a line-of-duty and a nonduty pension), and a disabling condition resulting from an act of police duty (necessary for a line-of-duty pension). Additionally, the Board found two bases for denying pension benefits even if Coyne had satisfied the necessary elements: his purported refusal to undergo reasonable medical treatment, and a lack of unanimity among the three board-appointed doctors regarding whether he was disabled from performing police work.

On administrative review, a judge from the Rock Island County circuit court upheld two of the Board's findings: that Coyne failed to

prove a disabling condition resulting from an act of police duty, and that he refused to undergo reasonable medical treatment. Accordingly, the judge affirmed the Board's decision although she disagreed with its remaining findings. Coyne then filed this appeal.

## ANALYSIS

■ In administrative cases our role is to review the decision of the administrative agency, not the decision of the circuit court. *Board of Education of Round Lake Area Schools v. State Board of Education*, 292 Ill. App. 3d 101 (1997). We do not reweigh the evidence or make an independent determination of the facts; rather, we ascertain whether the factual findings made by the administrative agency are against the manifest weight of the evidence. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76 (1992). Factual findings are against the manifest weight of the evidence only where "it is clearly evident the [agency] erred and should have reached the opposite conclusion." *Board of Education of Round Lake*, 292 Ill. App. 3d at 109.

### 1. Barbara Lee's Presence on the Pension Board

Coyne's first issue pertains to Barbara Lee's presence on the Board. Because of her position as village clerk, Coyne claims her service as a board member created "a hopeless conflict of interest" and denied his right to a fair and impartial hearing. The asserted conflict allegedly placed Lee in a "squeeze play" where a vote against pension benefits was desirable because it benefitted the Village financially. In Coyne's view, one of three things was necessary to make the proceeding fair: Lee should have recused herself, the Board should have disqualified her, or the Village should have withdrawn as a party to the action.

■ There is no question that a claimant in an administrative proceeding is constitutionally entitled to fair and impartial adjudication. *Klomann v. Illinois Municipal Retirement Fund*, 284 Ill. App. 3d 224 (1996). However, establishing impartiality requires more than merely stating why an adjudicator might have harbored bias. Persons serving on administrative tribunals are presumed to be fair and honest. *Jackson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 293 Ill. App. 3d 694 (1997). To prove bias or prejudice, a claimant must show that such persons were incapable of judging the controversy fairly and on the basis of its own circumstances. *Flaherty v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 311 Ill. App. 3d 62 (1999).

The case of *Danko v. Board of Trustees of the City of Harvey Pension Board*, 240 Ill. App. 3d 633 (1992), demonstrates proper applica-

tion of these principles. In *Danko* the chairman of a pension board was also the claimant's former boss. The chairman had been intricately involved in the events leading up to the pension hearing, and during the hearing he called the claimant a "liar." He also asserted that the claimant should have taken a light-duty position he (the chairman) had offered. Under these circumstances, the chairman was found to have harbored bias that violated the claimant's right to a fair hearing. *Danko*, 240 Ill. App. 3d 633; see *A.R.F. Landfill, Inc. v. Pollution Control Board*, 174 Ill. App. 3d 82 (1988) (when an administrative officer's conduct indicates that he or she has adjudged the case before actually hearing it, bias should be found).

The only evidence Coyne offers against Lee is the mere fact of her simultaneous service as village clerk and a member of the Board. Beyond stating that fact, Coyne's argument is essentially an inducement to reach negative conclusions based merely on assumptions about Lee's thought process. Such argument does not establish reversible error. Unlike the chairman in *Danko*, Lee's conduct did not signal a predetermined decision of the case. She openly asserted that she would be impartial, and her subsequent conduct did not indicate otherwise. Coyne has not overcome the presumption that Lee was fair and impartial.

The United States Supreme Court case of *Ward v. Village of Monroeville*, 409 U.S. 57, 34 L. Ed. 2d 267, 93 S. Ct. 80 (1972), is also instructive. In *Ward* a defendant was convicted of two municipal traffic offenses in a court where the judge was also the village mayor. The defendant argued that his due process rights were violated by the mayor's service as judge. The Supreme Court agreed because the mayor possessed "wide executive powers" (including responsibility for village finances), and "[a] major part of village income [was] derived from the fines, forfeitures, costs, and fees imposed by him in his mayor's court." *Ward*, 409 U.S. at 58, 34 L. Ed. 2d at 269-70, 93 S. Ct. at 82. Under such circumstances, the Court observed, the mayor perforce occupied two practically inconsistent positions; one involving partisanship to generate village revenue, and the other involving neutrality to fairly judge the case.

In reaching its decision, however, the Court distinguished its prior holding in *Dugan v. Ohio*, 277 U.S. 61, 72 L. Ed. 784, 48 S. Ct. 439 (1928). *Dugan* also involved a mayor who sat as a judge in municipal court. However, unlike the mayor in *Ward*, he possessed "very limited executive authority" and had but one vote on a five-member city commission. *Ward*, 409 U.S. at 60, 34 L. Ed. 2d at 271, 93 S. Ct. at 83. Under such circumstances, the Court observed, "the Mayor's relationship to the finances and financial policy of the city was too remote to

warrant a presumption of bias toward conviction in prosecutions before him as judge." *Ward*, 409 U.S. at 60-61, 34 L. Ed. 2d at 271, 93 S. Ct. at 83.

■ In the instant case, Lee was not similarly situated with the mayor in *Ward*. In fact her position was even more benign than the position of the mayor in *Dugan*. The record from the pension hearing shows that Lee had absolutely no financial decision-making power for the Village. Her duties were merely clerical. Accordingly, her connection to the Village's financial policy was too remote to warrant a presumption of bias toward denying pensions. In light of her ostensible impartiality, we see no basis for finding that her presence on the Board rendered the pension hearing unfair.

## 2. Ability to Perform Police Work

■ As noted above, to receive either a line-of-duty pension or a nonduty pension, a claimant must prove that he suffers from a disability preventing him from performing police work. See 40 ILCS 5/3—114.1, 3—114.2 (West 1996). In the instant case, the Board found that Coyne failed to prove such disability.

The record shows that six doctors evaluated Coyne and rendered opinions on his disability status. Doctors O'Keefe, Narayan, Conroe, Kelly, and Ostrov all stated that Coyne was disabled and could not perform police work. The opinions of Doctors O'Keefe and Narayan are especially noteworthy because, unlike the appointed evaluators, they had the benefit of assessing Coyne's situation through an extended course of treatment. Additionally, the testimony from Chief Baraks and Coyne himself supports the five doctors' opinions that Coyne was unfit to work in the police department.

Against this evidence, Doctor Harris stood alone in opining that Coyne was not disabled. The Board found that Doctor Harris was more credible than the other doctors and chose to adopt his opinion. However, the Board gave no explanation for this finding. Instead the Board merely stated: "[We choose] to place greater weight on the psychiatric report of Dr. Richard Harris, M.D. and for purposes of this Decision and Order adopt[ ] the following findings contained in Dr. Harris' January 23, 1997 report."

The circuit judge expressed concern over this matter. During oral arguments in the circuit court, the following colloquy occurred between the judge and the Board's counsel:

"THE COURT: Let me ask you a question as Mr. Marquis [Coyne's counsel] pointed out we didn't hear the doctors testify they just filed written reports so *** the Board could not assess the credibility of these physicians, and I believe in the Pension Board's opinion it states [they found] Dr. Harris' report more persuasive

but I don't believe the opinion states why they found it more persuasive.

MR. PUCHALSKI [Board's counsel]: Well, I don't know either, but I think again that's within the purview of the Board *** to determine when they have conflicts like they do in this type of case which way they're going to go, and I think if that report is in evidence and it's in the record and the Board indicates that is the report they're relying on I think the inquiry stops there, it's valid evidence. *** If the Board chooses to believe Harris then this court is bound under the manifest weight standard of review."

We disagree with counsel's interpretation of the manifest weight standard. Despite the existence of Doctor Harris' report, we still have an obligation to review the evidence and ascertain whether a conclusion opposite the Board's decision is clearly apparent from the record. *Cf. Brown Shoe Co. v. Gordon*, 405 Ill. 384 (1950) (noting that the manifest weight standard is not a mere stamp of approval for agency decisions).

In light of the considerable evidence against Doctor Harris' opinion, the circuit judge reversed the Board's finding on this issue—flatly concluding that it was against the manifest weight of the evidence. We certainly understand the judge's concerns. However, we are also mindful of the injunction against appellate courts reweighing the evidence and making independent factual determinations. *Abrahamson*, 153 Ill. 2d 76. Our standard of review gives the Board the benefit of the doubt. But with no articulation of the findings upon which the Board based its determination, we cannot extend that benefit in an informed manner. An administrative agency's prerogative undoubtedly includes making credibility determinations between doctors who render competing opinions. But when the evidence weighs heavily against a single doctor, and the agency chooses to adopt that doctor's opinion, the agency must articulate the findings underlying its choice to facilitate meaningful review.

Considering the nature of our role as an appellate court, we believe the appropriate course is to remand with instructions for the Board to conduct further proceedings consistent with the foregoing observations.

### 3. "An Act of Police Duty"

■ Under section 3—114.1 of the Illinois Pension Code (the Code), a police officer is entitled to a line-of-duty pension if his disability results from "the performance of an act of duty." 40 ILCS 5/3—114.1 (West 1996). In cases involving claims of duty-related stress, the officer must prove disability resulting from a specific, identifiable act of duty unique to police work. *Robbins v. Board of Trustees of the Car-*

*bondale Police Pension Fund*, 177 Ill. 2d 533 (1997). Accordingly, a line-of-duty pension is not allowed for disability resulting from "generalized police stress of multiple origins." *Robbins*, 177 Ill. 2d at 543; see *Trettenero v. Police Pension Fund*, 268 Ill. App. 3d 58 (1994) (noting that where an officer's disability is traceable only to the general nature of police work rather than a specific act of police service, a line-of-duty pension is denied).

The officer in *Robbins* claimed his psychological disability stemmed specifically from witnessing a suicide where a man shot himself in the face with a shotgun. The doctors who treated and examined the officer agreed that his stress was related to his police work; however, they did not connect the stress to any specific act he performed in the line of duty. For example, one doctor attributed the officer's stress to " '[h]is continuous exposure to possible violence, as well as the pace of his duties in general.' " (Emphasis omitted.) *Robbins*, 177 Ill. 2d at 544. In light of this evidence, the pension board denied the officer's request for line-of-duty benefits, and the Illinois Supreme Court affirmed the denial. *Robbins*, 177 Ill. 2d 533.

■ The facts of the instant case call for the same result. The record is replete with evidence that Coyne's psychological disorder resulted from the cumulative effect of traumatic duties he performed over his career as a police officer. The medical evidence shows that no specific act of his employment caused the disorder; rather, he developed problems over time in response to stressful work-related situations. This scenario does not satisfy the "act of duty" requirement in section 3—114.1. Accordingly, the Board's decision to deny a line-of-duty pension on this ground is not against the manifest weight of the evidence.

### 4. Refusal of Treatment

■ Regardless of the type of pension a claimant seeks, a compensable disability will not be found if he unreasonably refuses necessary medical treatment. *Mulack v. Hickory Hills Police Pension Board*, 252 Ill. App. 3d 1063 (1993). In other words, the term "disability" excludes conditions that can be remedied without significant danger or extraordinary suffering and when medical opinion offers a reasonable prospect for relief. *Mulack*, 252 Ill. App. 3d 1063. However, medicine is not an exact science, and if a claimant's refusal of treatment is within the bounds of reason, his freedom of choice should be preserved even though the treatment might mitigate the employer's damages. *Mulack*, 252 Ill. App. 3d 1063.

■ On this issue the Board based its decision solely on Doctor Kelly's May 9, 1997, report. Doctor Kelly opined that "[a]dditional psychiatric treatment is reasonably expected to result in Officer Coyne

being in full remission of his depression, and to be able to return to full and unrestricted police duties." The doctor's report continued:

"When interviewed on January 16, 1997, Officer Coyne stated that his medication and his visits with Dr. O'Keefe did benefit him, and had helped his symptoms. He admitted that he needed to increase the frequency of his appointments to once per week. (He said he was seeing Dr. O'Keefe every two to three weeks and recently once per week, and he saw Dr. Narayan infrequently, every three months.) Records indicate that Officer Coyne has responded to medications \*\*\*. Records also indicate that Officer Coyne admits he has stopped medications on his own at times \*\*\*. In his interview on January 16, 1997, Officer Coyne admitted to being resistant to taking medications[:] 'you're supposed to be a man, a policeman, not let anything bother you.... Dr. O'Keefe wanted me to go in the hospital, but I don't like hospitals and I'm not crazy, to be put in a looney-toon bin, be locked up. Doctor Narayan has changed the doses of medications... maybe he lowered them too much. I ain't going on pills my whole life.' Records (13) indicate that Officer Coyne has been treated with low doses of antidepressant medications (Zoloft 50 mg. Trazodone 50 mg.) His partial response to medication (as reflected in the persistence of depressive symptoms) is likely relat[ed] to lack of sufficient dose of antidepressant medications and lack of compliance in taking medication on the part of Sergeant Coyne."

After reproducing this report in its written decision, the Board merely stated: "[Coyne] has given no plausible reason for his refusal to follow the prescribed treatment regimen recommended by his own physicians. \*\*\* [T]he weight of the psychiatric evidence establishes that a reasonable treatment regimen exists, without unreasonable risk that would allow [Coyne] to return to full unrestricted police duties, if followed by [Coyne]. \*\*\* Since [Coyne] has refused, he is not 'disabled' as that term is contemplated under the \*\*\* Pension Code."

This analysis is insufficient to sustain a denial of pension benefits. By relying entirely on Doctor Kelly's report, the Board limited itself to the information contained in that report—most of which stemmed from an interview in January of 1997. We cannot simply draw a line between 1996 and 1997 and then conclusively declare, based on events preceding the line, that Coyne's conduct disqualifies him from receiving pension benefits. By doing so, the Board effectively ignored the year's worth of treatment Coyne underwent in 1997. Before the Board can conclusively determine whether Coyne's treatment choices disqualify him from pension eligibility, it must consider the entire course of his treatment. This observation is particularly apt considering the above-stated rule that if a claimant's treatment choices are

reasonable, his freedom of choice should be preserved even if he declines treatment that might mitigate the employer's damages. *Mulack*, 252 Ill. App. 3d 1063. The Board apparently never even considered whether the treatment Coyne opted to undergo was reasonable (choosing instead to focus merely on the fact that he declined some treatment). Such analysis is incomplete.

Furthermore, when the Board adopted Doctor Kelly's report, it repeated the omission we discussed above in connection with Doctor Harris' report. Based on Doctor Kelly's opinion, the Board stated that "the weight of the psychiatric evidence showed that Coyne, with further treatment, could resume unrestricted police duties." Yet the Board did not provide any explanation for its conclusion regarding evidentiary weight. Such an explanation is incumbent under the instant facts, where among the five doctors who concluded that Coyne was disabled, Doctor Kelly stood alone in opining that he could be rehabilitated and resume unrestricted police work as a police officer. In fact, both of Coyne's treating physicians advised him to get out of police work altogether.

On remand the Board is instructed to conduct further proceedings consistent with these observations.

### 5. Physicians' Certificates of Disability

■ Section 3—115 of the Code reads:

> "A disability pension shall not be paid unless there is filed with the board *certificates of the police officer's disability*, subscribed and sworn to by the police officer if not under legal disability, or by a representative if the officer is under legal disability, and by the police surgeon (if there be one) and *3 practicing physicians selected by the board*. The board may require other evidence of disability." (Emphasis added.) 40 ILCS 5/3—115 (West 1996).

In its written decision, the Board interpreted this language as requiring a unanimous declaration from its three appointed doctors that Coyne was disabled for police work. Since Doctor Harris opined that Coyne was not so disabled, the Board summarily denied benefits.[1]

■ The circuit judge disagreed with this interpretation of section 3—115, finding that the relevant statutory language was ambiguous. After examining the language (including the constitutional ramifications of the Board's interpretation), the judge construed section 3—115 as requiring three medical certificates addressing Coyne's *disability*

---

[1]This view has apparently gained favor in two districts of the appellate court. See *Rizzo v. Board of Trustees of the Village of Evergreen Park Police Pension Fund*, 338 Ill. App. 3d 490 (1st Dist. 2003); *Daily v. Board of Trustees of the Police Pension Fund*, 251 Ill. App. 3d 119 (4th Dist. 1993).

*status*. Since all three of the certificates met this standard, the judge concluded that Doctor Harris' opinion did not *ipso facto* disqualify Coyne from receiving pension benefits.

We agree with the judge's conclusion. The key inquiry in our certificate analysis involves the meaning of the qualifying label "of disability."

Our dictionary search has revealed no fewer than 21 nuances for the word "of." Possible definitions range from "[d]erived or coming from" to "[d]uring or on a specified time." The American Heritage College Dictionary 964 (4th ed. 2002). This range injects ambiguity into the pivotal statutory language. In fact, several legitimate definitions for the word "of" directly contradict the Board's position. Three such definitions are "[c]entering on" or "directed toward," "[w]ith reference to" or "about," and "[i]n respect to." The American Heritage College Dictionary 964 (4th ed. 2002). These definitions easily encompass a certificate addressing a claimant's disability status generally, regardless of the doctor's ultimate opinion about whether the claimant can perform police work.

The meaning of the word "disability" is also instructive. A description of someone as merely "disabled" conveys only general meaning because it says nothing about the degree of the person's incapacity. Disabilities come in various shapes and sizes. For instance, in prescribing workers' compensation benefits the legislature has articulated at least three different categories of disability: temporary total incapacity, permanent partial incapacity, and permanent total incapacity. See 820 ILCS 305/8 (West 2002).

The legislature also recognized varying degrees of disability in the Pension Code. Section 3—114.2 reads:

> "A police officer who becomes disabled as a result of any cause other than the performance of an act of duty, and who is found to be physically or mentally disabled so as to render necessary his or her suspension or retirement from police service in the police department, shall be entitled to a [nonduty] disability pension ***." 40 ILCS 5/3—114.2 (West 1996).

This statute prescribes a two-step process. First, the police officer suffers a disability; then the pension board decides whether the degree of the disability is sufficient to trigger pension benefits. See also 40 ILCS 5/3—114.1 (West 2000) (where the officer first suffers a sickness or injury, and then the board determines if the resulting condition meets the elevated disability standard for triggering pension benefits).

In the certificate provision of section 3—115, the legislature referenced "disability" in a general fashion without elevating the term as it did in section 3—114.2. This fact, combined with the above-

mentioned range of definitions for the word "of," results in ambiguity regarding the content of the required certificates. When faced with such ambiguity, we employ established tenets of statutory construction. One primary tenet requires construction in a manner that avoids absurd or unconstitutional results. See *In re Loss*, 119 Ill. 2d 186 (1987).

We believe the Board's interpretation of section 3—115 yields a result that is both absurd and unconstitutional. Although the Board adjudicated several issues other than the certificate requirement, such action was superfluous if the Board's interpretation of that requirement is carried to its logical conclusion. *As a threshold matter* in all cases, the three physicians specified in section 3—115 would each have to certify that the applicant was disabled *for police work*. The opinion of a lone minority dissenter like Doctor Harris (five contrary opinions notwithstanding) would *ipso facto* defeat a pension claim, thus rendering section 3—115 a virtual summary dismissal provision. A pension board would have no use for an evidentiary hearing in such cases because, regardless of the weight of the claimant's evidence, and regardless of any credibility issues pertaining to the lone dissenting physician, the outcome of the case would be predetermined by the mere existence of a disagreement between witnesses. We cannot believe the legislature would establish the adjudicatory process outlined in the Pension Code expecting that the process would be so easily precluded.

On this point, the dissent states: "[T]here is nothing in the statutory language to stop a claimant from petitioning the Board to appoint a fourth physician to examine him in an effort to secure the necessary three certificates of disability." 347 Ill. App. 3d at 732. This assertion is troublesome because it transforms legislative silence into authorization for unspoken acts. There are many things the legislature did not explicitly address in the Pension Code (one way or the other). According to the dissent's reasoning, all such things are allowed.

From a constitutional standpoint, membership in a government pension system creates an enforceable contractual relationship where benefits cannot be diminished or impaired. Ill. Const. 1970, art. XIII, § 5. Thus, pension proceedings must conform to the requirements of due process of law. See *Trettenero v. Police Pension Fund*, 333 Ill. App. 3d 792, 800 (2002) (noting that section 3—115 requires "three medical certifications of [the claimant's] disability status"). It is axiomatic that due process requires adequate notice and a hearing. Yet, as noted above, the Board's interpretation of section 3—115 precludes any effective hearing. A claimant like Coyne could present compelling evidence supporting his case, yet his effort would be in vain because the opinion of a lone dissenting physician would *ipso facto* dispose of

the case. And this result would not change even if the claimant's evidence convincingly challenged the lone dissenter's credibility.

The key question pertains to the quality of the claimant's disability: whether the nature of the disability is "so as to render necessary his or her suspension or retirement from" police service. 40 ILCS 5/3—114.1, 3—114.2 (West 1996). This is a question of fact that must be decided by the trier of fact. The Board's interpretation of section 3—115 would turn the decision over to three witnesses. We are confident that dispositive fact-finding by witnesses does not comport with due process. Accordingly, we reverse the Board's denial of benefits on the certificate issue.

## CONCLUSION

For the above-stated reasons, the decision of the Board is affirmed in part, reversed in part, and remanded for further proceedings.

Affirmed in part, reversed in part, and remanded with instructions.

BARRY, J., concurs.

JUSTICE SCHMIDT, concurring in part and dissenting in part:

I concur with the majority's decision that the presence of Barbara Lee on the pension board did not deny the plaintiff a fair hearing. However, I dissent from the remainder of the opinion.

As the majority points out, section 3—115 of the Code reads, in part:

> "A disability pension *shall not be paid* unless there is filed with the board certificates of the police officer's disability, subscribed and sworn to by the police officer if not under legal disability, *** and by the police surgeon (if there be one) and *3 practicing physicians selected by the board*." (Emphasis added.) 40 ILCS 5/3—115 (West 1996).

The Board selected three physicians to exam the plaintiff. Two signed certificates stating the plaintiff was disabled. One signed a certificate stating the plaintiff was not disabled.

The issue is what the legislature meant when it referred to "certificates of the police officer's disability." The language of a statute must be given its plain and ordinary meaning. *Franzese v. Trinko*, 66 Ill. 2d 136, 361 N.E.2d 585 (1977). There is no rule of construction which allows courts to declare that the legislature did not mean what the plain language of the statute imports; where enactment is clear and unambiguous, a court is not at liberty to depart from the plain language and meaning of the statute by reading into it exceptions,

limitations, or conditions that the legislature did not express. *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 630 N.E.2d 820 (1994). If legislative intent can be ascertained from a statute's plain language, that intent must prevail without resort to other interpretive aides. *Paris v. Feder*, 179 Ill. 2d 173, 688 N.E.2d 137 (1997). Like the other districts of the Illinois Appellate Court that have examined this statute, I find nothing ambiguous about the term "certificates of the police officer's disability." That is, section 3—115 plainly refers to a certificate stating that the police officer is disabled in one form or another.

In a tortured, "Clintonesque" fashion, the majority states that the outcome is dependent on the definition of the word "of," and therefore the statute is ambiguous. 347 Ill. App. 3d at 728. After finding the word "of" ambiguous, the majority goes on to hold that a certificate of disability actually encompasses a certificate that says the police officer is not disabled. I cannot agree.

Under this line of reasoning, a sworn affidavit that said a person does not own a car would become a "certificate of title"; one that said he had no insurance would become a "certificate of insurance"; one that said an automobile owner had not paid the registration fees to the State would become a "certificate of registration," and so on. You get the picture.

I believe that the absurdity of the majority's position is further illustrated by the fact that its view would allow the Board to pay a disability pension to a police officer where every certificate on file, including the officer's, indicated that he was *not* disabled.

Because I think the language is clear, there is no need for resorting to any of the tools of judicial interpretation, such as examining legislative intent. We should enforce the statute as clearly written. However, if we look at legislative intent, I draw an opposite conclusion from that of the majority.

Section 3—115 of the Code, as previously mentioned, says that a disability pension shall not be paid without the requisite certificates. However, once all of the required certificates are filed, "the board may require other evidence of disability." 40 ILCS 5/3—115 (West 1996). That is, even faced with three certificates of disability signed by physicians selected by the Board, the Board can require additional evidence of disability before awarding a disability pension. This shows a legislative intent to require very strong proof before the award of a disability pension.

As the majority points out, two other districts of the appellate court have previously held that the statute means what it says. See *Rizzo v. Board of Trustees of the Village of Evergreen Park Police Pen-*

732

*sion Fund*, 338 Ill. App. 3d 490, 788 N.E.2d 1196 (2003); *Daily v. Board of Trustees of the Police Pension Fund*, 251 Ill. App. 3d 119, 621 N.E.2d 986 (1993). When the courts construe a statute and that construction is not interfered with by the legislature, it is presumed that such construction is in harmony with the legislative intent. *Consumers Co. v. Industrial Comm'n*, 364 Ill. 145, 4 N.E.2d 34 (1936). The statute has not been amended since the Fourth District Appellate Court rendered its decision construing the statute in 1993.

While the legislature clearly required that certificates of disability be filed by three practicing physicians selected by the Board, there is nothing in the statutory language to stop a claimant from petitioning the Board to appoint a fourth physician to examine him in an effort to secure the necessary three certificates of disability.

I am not unsympathetic to police officers. Having more than a passing familiarity with police work, I note that the problems related by the plaintiff, save for the alleged suicidal ideation and the claim that he went to work with an unloaded gun, are certainly issues familiar to any experienced police officer.

Were I in the legislature, I would vote in favor of rewriting the statute to allow the Board more flexibility with respect to the certificates of disability. I am not. Therefore, I must dissent. I would confirm the decision of the Board.